IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOSEPH MACKEN,<br>on behalf of himself and all others similarly<br>situated,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ASTRAZENECA PHARMACEUTICALS LP;<br>and ZENECA, INC.,<br><br>                    Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **Civil Action No.** _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, Joseph Macken ("Plaintiff"), by his attorneys, on behalf of himself and all others similarly situated (the "Class," defined below), brings this complaint for violations of the Delaware Consumer Fraud Act and for unjust enrichment at common law against Defendants AstraZeneca Pharmaceuticals LP and Zeneca, Inc. (together "AstraZeneca" or the "Company"). Upon personal knowledge as to his own acts, and upon information and belief (based on the investigation of counsel) as to all other matters, Plaintiff alleges as follows:

### I. NATURE OF THE ACTION

1.      In this action, Plaintiff seeks damages he has incurred on account of having paid for the drug Nexium (esomeprazole) when the related drug Prilosec (omeprazole) is as clinically effective, is available in generic form, is less expensive, and is available over the counter for the treatment of certain conditions. These damages have been caused by AstraZeneca's sale and

promotion of Nexium pursuant to practices and acts that are deceptive and misleading in violation of the Delaware Consumer Fraud Act.

2.    Plaintiff also seeks restitution for AstraZeneca's unjust enrichment -- ill-gotten gains acquired as a result of their deceptive marketing of Nexium.

3.    AstraZeneca had a patent for the drug omeprazole, which was marketed under the brand name Prilosec. Prilosec is a proton-pump-inhibitor ("PPI") or acid pump inhibitor that is used to treat heartburn and erosive esophagitis, erosion of the esophagus due to acid reflux. By the year 2000, Prilosec was the top selling and most widely prescribed drug in the world, with sales of nearly $6 billion annually

4.    A patented drug is also referred to as a "brand name" drug. Brand name drugs, which face no competition, are the most profitable drugs for drug manufacturers. In the year 2000, the average retail price of a brand name prescription drug was more than three times that of a generic drug.[1]

5.    The patent for Prilosec was set to expire in 2001, and AstraZeneca anticipated that it would face stiff competition from generic manufacturers. It is a fact well known to drug manufacturers that entry of generics results in a substantial loss of market share, sharply reduced prices and a decrease in profits. Come 2001, AstraZeneca was facing the loss of its most profitable drug.

6.    Consequently, years before the Prilosec patent was set to expire, AstraZeneca formed a group of marketers, lawyers and scientists to find a solution for what the Company

---

[1]    Janet Lundy, Benjamin Finder, & Gary Claxton, Henry J. Kaiser Family Foundation, *Trends and Indicators in the Changing Health Care Marketplace*, 2004 Update (April 2004), available at: http://www.kff.org/insurance/7031/index.cfm (last visited February 14, 2005).

believed was a looming patent-expiration disaster. The group called itself the "Shark Fin Project" after the dismal shape the sales chart would form if they did nothing: an inverted V.

7.    The Shark Fin Project developed a multi-prong attack. First, it attacked generic manufacturers in court, seeking to delay entry of competition. Second, the Shark Fin Project sought to ensure that AstraZeneca's revenues from Prilosec would not decline, even though its loss of patent protection was inevitable. Thus, shortly before the patent on Prilosec was set to expire, the Company got FDA approval for the newly-patented Nexium, which is a PPI comprised of the more active half of the active ingredient in Prilosec.

8.    AstraZeneca then launched a massive advertising campaign to persuade Prilosec users and their doctors that Nexium was somehow better. Very quickly, Nexium became the most heavily advertised drug in the United States. The media was blanketed with Nexium ads - "Today's purple pill" is Nexium, from the makers of Prilosec."

9.    Based on flawed studies and trials, AstraZeneca deceptively promoted Nexium to doctors and consumers as the "first proton pump inhibitor (PPI) to offer significant clinical improvements over [Prilosec] and its main competitor, lansoprazole, in terms of acid control and clinical efficacy."[2] It also claimed that Nexium was more effective in acid inhibition than other comparable drugs and provided relief in a shorter period of time. AstraZeneca repeated this message in a flood of marketing activities directed to patients and doctors.

10.    AstraZeneca's campaign worked. While sales of Prilosec fell, sales of Nexium skyrocketed, reaching $3.3 billion in annual sales by 2003.

11.    AstraZeneca's Nexium promotional and advertising campaign has resulted in billions of dollars of unnecessary drug expenditures by Plaintiff and the Class. AstraZeneca

---

[2]    AstraZeneca Annual Report Form 20-F-2000 at p. 11.

justified Nexium's superiority and effectiveness based on flawed and misleading clinical studies sponsored by AstraZeneca. As a result of this misleading campaign, hundreds of thousands of patients have spent millions of dollars in unnecessary prescriptions for Nexium, when generic omeprazole (the active ingredient in Prilosec) is available at much lower prices. Generic omeprazole by prescription retails for approximately 30 percent less than Nexium.

12. Indeed, the former administrator of the federal Centers for Medicare and Medicaid Services ("CMS"), Thomas Scully, stated to a convention of doctors at the American Medical Association: "You should be embarrassed if you prescribe Nexium because it increases costs with no medical benefits."[3] Mr. Scully noted, "the fact is Nexium is Prilosec ... [i]t is the same drug. It is a mirror compound." Mr. Scully further stated that "*Nexium is a game that is being played on the people who pay for drugs.*" Mr. Scully's comments are too late -- AstraZeneca has succeeded in capturing the market.

## II. PARTIES

13. Plaintiff Joseph Macken is an individual residing in East Meadow, Nassau County, New York. During the class period, Plaintiff purchased Nexium for his own consumption and was injured as a result of the conduct alleged herein.

14. Defendant Zeneca, Inc. is a Delaware corporation with its principal place of business at Malvern, Pennsylvania. Zeneca, Inc., is a wholly owned subsidiary of AstraZeneca Group PLC, a public limited company domiciled in the United Kingdom.

15. Defendant AstraZeneca Pharmaceuticals LP, is a Delaware Limited Partnership, with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware.

---

[3] *New York Times*, April 21, 2003.

AstraZeneca Pharmaceuticals LP is owned and controlled by AstraZeneca Group PLC, a public limited company domiciled in the United Kingdom.

16.    AstraZeneca maintains research and development and manufacturing facilities worldwide, including in the United States. AstraZeneca reported annual sales of $18.8 billion in 2003, with an operating profit of $4.2 billion. Its 2003 sales of Nexium were $3.3 billion, or 17% of all sales.

### III. JURISDICTION AND VENUE

17.    This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which, *inter alia*, amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000). *See* 28 U.S.C. § 1332(d)(2) and (6). This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of the Court and Defendants systematically and continually conduct business throughout the State of Delaware, including marketing, advertising, and sales directed to Delaware residents.

18.    Venue is proper here in that Defendants are organized within the District, the Defendant engaged in substantial conduct relevant to the claims within this District, and Plaintiff suffered substantial loss for purchases of Nexium made within the District.

### IV. FACTUAL ALLEGATIONS

19.    Prilosec (also known as Losec) is a PPI and, according to AstraZeneca's publicly filed documents, by the year 2000 had "set a new global standard in short and long-term treatment of acid related diseases." According to AstraZeneca's publicly filed documents,

Prilosec had benefited patients in 530 million patient treatments since 1980, and "is the world's largest selling pharmaceutical." Prilosec was AstraZeneca's most profitable drug with worldwide sales of over $6 billion by 2000.[4]

20.     Omeprazole, the active ingredient in Prilosec, is a "racemic" mixture containing S- and R-enantiomers. Enantiomers are molecules that have two non-superimposable mirror image forms, i.e. a right and left hand version. Racemic mixtures, such as Prilosec, contain equal proportions of the two enantiomers. So, 20 mg of Prilosec (i.e. omeprazole) is really 10 mg of the R-enantiomer and 10mg of the S-enantiomer.

21.     However, in humans, the S-enantiomer of omeprazole is more active than the R-enantiomer, in part due to its better metabolization.

22.     Patent protection for omeprazole expired in all major markets by the end of 2000, but patent term extensions extended protection until April 2001 in the United States.

23.     With the looming loss of patent protection, AstraZeneca faced the prospect of significant sales erosion of its number one selling drug. To put this in perspective, sales of Prilosec of $5.9 billion in 2000 comprised 39% of AstraZeneca's revenue, with the next drug at 8%.

24.     Faced with the catastrophic loss of sales from its flagship drug, AstraZeneca carefully plotted a new strategy years in advance of Prilosec's patent expiration. The plotting was done by members of the "Shark Fin Project," a secret group of marketers, lawyers and scientists charged with developing a strategy for averting the patent-expiration disaster. The name of the group derives from the dismal shape the sales chart would trace if AstraZeneca did nothing: an inverted V. Eventually, the centerpiece of that strategy was the marketing and

---

[4]    2001 Annual Report at p. 38.

promotion of the new drug Nexium. Nexium was viewed by several executives in the Shark Fin Project as the worst solution, because it was not any better for ordinary heartburn than Prilosec.

25.    Nexium is simply the S-enantiomer of omeprazole, which was patented under the name *es*omeprazolem, or Nexium. Thus, Nexium is simply Prilosec without the less active R-enantiomer.

26.    AstraZeneca's plan was to promote Nexium as an improvement over Prilosec, and to have brand loyalty built before the expiration of Prilosec's patents. AstraZeneca knew that brand loyalty is critical - once a doctor selects a drug for a certain treatment - he/she is unlikely to change. The same is true for the consumer.

27.    To help with the switch, AstraZeneca originally priced Nexium below Prilosec, gave discounts to managed care plans and hospitals, bombarded doctors with free samples, and even offered coupons in newspapers and on its website. (Exhibit A). AstraZeneca's 6,000 salespeople also barraged doctors with studies proclaiming Nexium's superiority. The promotional campaign reportedly cost the Company half a billion dollars - just in the year 2001.

28.    Virtually overnight, Nexium - the "new" purple pill - began to replace Prilosec. Soon the Company dropped all references to the older drug, Prilosec, in its advertisements. Now it just refers to "the purple pill called Nexium."

29.    AstraZeneca even redesigned its website to erase all memory of Prilosec. AstraZeneca's www.purplepill.com website was devoted to the Prilosec through March 2001. In April, 2001, the website was updated to allow users to sign up to be notified when the Nexium website premiered. At the same time, the Prilosec information was moved to www.priloseconline.com. Then, www.purplepill.com went from being a Prilosec website to a

Nexium website. Although AstraZeneca could have easily developed a new website for Nexium, it chose to target consumers already familiar with Prilosec.

30.    Prilosec OTC is sold OTC for a fraction of the cost of Nexium; Prilosec OTC sells at around $0.70 per pill while Nexium garners over $4.00 per pill. Although they are nearly identical in every respect, Prilosec OTC is indicated for frequent heartburn while generic omeprazole available by prescription is indicated for frequent heartburn and erosive esophagitis, ostensibly because the treatment of the more severe condition requires a doctor's supervision.

31.    If it were not for AstraZeneca's deceptive Nexium promotional campaign, Plaintiff and the Class would not have be paid high costs for the treatment of heartburn because Prilosec OTC is just as effective. Moreover, were it not for AstraZeneca's false and misleading marketing of Nexium, Plaintiff and the Class would have paid substantially less for the treatment for erosive esophagitis because generic omeprazole, available by prescription, is just as effective. Thus, AstraZeneca has duped Plaintiff and the Class into paying a premium for Nexium, which, contrary to AstraZeneca's promotional material, is no more effective than Prilosec OTC and prescription omeprazole.

32.    To get approval from the U.S. Food and Drug Administration ("FDA") for Nexium, AstraZeneca had to test it in several clinical trials. Some of these trials merely compared Nexium with placebos to show that it worked better than nothing, since that is all the FDA requires. But four trials compared Nexium head-to-head with Prilosec for esophageal erosions, and these were crucial to AstraZeneca's marketing strategy. The Company wanted to show that Nexium was better than Prilosec - an advance over the older drug.

33.    In total, AstraZeneca submitted 11 efficacy studies and three supportive trials for consideration by the FDA with its NDA for Nexium. *See* Stephen G. Hundley, *FDA*

*Pharmacology / Toxicology Review and Evaluation*, Nexium NDA 21-154, 1-2 (October 31, 2000) ("FDA Review"). Only <u>four</u> of the eleven studies and the three supportive trials actually compared Nexium with omeprazole. The remaining studies compared Nexium with a placebo.

34.    Study 172 compared the efficacy of 40 mg Nexium, 20 mg Nexium, and 20 mg omeprazole in healing erosive esophagitis. A sample size of 500 patients per treatment was chosen in order to ensure the ability to detect a 10% difference in healing with 95% accuracy. Not surprisingly, 40 mg Nexium had a statistically significant higher healing proportion than 20 mg omeprazole, 87.6% versus 81.4%. However, the targeted therapeutic gain of 10% was not reached. In addition, there was no statistically significant difference between 20 mg of Nexium and 20 mg omeprazole according to the FDA reviewer.

35.    Study 172 also evaluated 40 mg Nexium, 20 mg Nexium and 20 mg omeprazole for heartburn resolution. The study revealed that there was no significant difference in heartburn resolution between 20 mg Nexium and 20mg omeprazole. In fact, there was only a statistical difference at week 4, not at week 8, between 40 mg Nexium and 20 mg omeprazole. The study's authors did claim a statistically significant lower number of heartburn free nights with 20 mg of Nexium versus 20 mg omeprazole, but there was no significant difference in heartburn free days and more patients using 20 mg of omeprazole had sustained heartburn resolution by day one of the study.

36.    Possibly to remedy the failure to obtain the targeted therapeutic gain of 10% in Study 172, study 173 attempted to reproduce the unremarkable, statistically significant difference between 40 mg of Nexium and 20 mg of omeprazole. This time, however, there was no statistically significant difference between 40 mg Nexium and 20 mg omeprazole. Even at twice the dose, the study "failed to demonstrate the superiority of [Nexium] over [omeprazole]."

*FDA Review* at 10. Study 173 did not even attempt to compare 20 mg Nexium and 20 mg omeprazole.

37.    AstraZeneca attempted yet again to prove that 40 mg of Nexium was better at healing erosive esophagitis than 20 mg of omeprazole in Study 222. This time, however, over 1000 patients per treatment were used. This number of patients reduced the amount of therapeutic gain required to ensure a 95% accuracy rate from 10% to 5% therapeutic gain. With this lower measure of therapeutic gain, AstraZeneca was finally able to show, within the parameters of the study, that 40 mg of Nexium was more effective than 20 mg of omeprazole.

38.    However, the FDA reviewer noted that "the superiority of [40 mg Nexium] over [20 mg omeprazole] was demonstrated by comparing two treatments at different dose level [sic] and does not lead to the conclusion that [Nexium] is superior to omeprazole in healing [erosive esophagitis]." *FDA Review* at 14.

39.    Study 174 compared 20 mg Nexium with 20 mg omeprazole. As with Study 172, the FDA reviewer found no statistically significant difference in healing between 20 mg of Nexium and omeprazole. *FDA Review* at 10.

40.    Of the three supportive trials submitted by AstraZeneca with the Nexium NDA, one compared 40mg and 20mg Nexium with 20 mg omeprazole; one compared 40mg Nexium and 20mg omeprazole; and one compared 20 mg Nexium and 20 mg omeprazole. "All three studies failed to demonstrate superiority of [Nexium] over [20 mg omeprazole]." *FDA Review* at 36.

41.    The package insert provided with Nexium contains charts summarizing substantially similar study results. The percentage healing rates provided are different in absolute terms than the rates cited by the FDA reviewer, due to the inclusion of different data

and/or other variations between the data and samples used, but the overall results are substantially similar to those found by the FDA reviewer. The studies are summarized in the following chart:

Erosive Esophagitis Healing Rate (Life-Table Analysis)

| Study | No. of Patients | Treatment Groups | Week 4 | Week 8 | Significance Level* |
|-------|-----------------|------------------|--------|--------|---------------------|
| 1 | 588 | NEXIUM 20 mg | 68.7% | 90.6% | N.S. |
|   | 588 | Omeprazole 20 mg | 69.5% | 88.3% | |
| 2 | 654 | NEXIUM 40 mg | 75.9% | 94.1% | $p < 0.001$ |
|   | 656 | NEXIUM 20 mg | 70.5% | 89.9% | $p < 0.05$ |
|   | 650 | Omeprazole 20 mg. | 64.7% | 86.9% | |
| 3 | 576 | NEXIUM 40 mg | 71.5% | 92.2% | N.S. |
|   | 572 | Omeprazole 20 mg | 68.6% | 89.8% | |
| 4 | 1216 | NEXIUM 40 mg | 81.7% | 93.7% | $p < 0.001$ |
|   | 1209 | Omeprazole 20 mg | 68.7% | 84.2% | |

*log-rank test vs. omeprazole 20 mg
N.S. = not significant ($p > 0.05$).

42.    One notable difference between the results cited by the FDA reviewer and those provided in the package insert is that a statistically significant difference is indicated between 20 mg Nexium and 20 mg omeprazole in study 2 in the chart, whereas the FDA reviewer found no statistically significant difference in the equivalent study, Study 172, between 20 mg Nexium and 20 mg omeprazole. This is because the package insert chart evaluated statistical significance at the .05 level, whereas the FDA reviewer required a more stringent .025 significance level. Furthermore, the difference was only statistically significant at 8 weeks, not at four weeks.

43.    Another chart provided in the package insert for Nexium purporting to summarize "Sustained Resolution of Heartburn" shows no statistically significant difference between 20 mg Nexium and 20 mg omeprazole in the same study:

Sustained Resolution* of Heartburn (Erosive Esophagitis Patients)

| Study | No. of Patients | Treatment Groups | Cumulative Percent# with Sustained Resolution | | Significance Level* |
|-------|-----------------|------------------|---------|---------|---------------------|
| | | | Day 14 | Day 28 | |
| 1 | 573 555 | NEXIUM 20 mg Omeprazole 20 mg | 64.3% 64.1% | 72.7% 70.9% | N.S. |
| 2 | 621 620 626 | NEXIUM 40 mg NEXIUM 20 mg Omeprazole 20 mg. | 64.8% 62.9% 56.5% | 74.2% 70.1% 66.6% | p <0.001 N.S. |
| 3 | 568 551 | NEXIUM 40 mg Omeprazole 20 mg | 65.4% 65.5% | 73.9% 73.1% | N.S. |
| 4 | 1187 1188 | NEXIUM 40 mg Omeprazole 20 mg | 67.6% 62.5% | 75.1% 70.8% | p <0.001 |

*Defined as 7 consecutive days with no heartburn reported in daily patient diary. #Defined as the cumulative proportion of patients who have reached the start of sustained resolution.
*log-rank test vs. omeprazole 20 mg
N.S. = not significant (p >0.05).

44.    Prilosec (i.e. omeprazole) contains equal proportions of the two enantiomers (R- and S-).  20 mg of Prilosec is really 10 mg of the S-enantiomer and 10mg of the R-enantiomer. However, in humans, the S-enantiomer is more active than the R-enantiomer, in part due to its better metabolization.    Thus, when faced with the expiration of its patent on Prilosec, AstraZeneca patented just the S-enantiomer of omeprazole under the name esomeprazole. Nexium contains esomeprazole, *i.e.,* the S-enantiomer of omeprazole, and therefore, is simply Prilosec without the less active R-enantiomer.

45.    Even when comparing equal doses.  Nexium has a greater proportion of the more active S-enantiomer than Prilosec.   "[A] 20 mg tablet of single-isomer esomeprazole [i.e. Nexium] contains the same amount of active ingredient as a 40mg tablet of racemic omeprazole [i.e. Prilosec]."   Stephen C. Stinson, *Chiral Drugs*, 78 Science/Technology No. 43, 55-78

(October 23, 2000), available at: http://pubs.acs.org/cen/coverstory/7843/print/7843scit1.html. (last visited April 14, 2005).

46.    Therefore, even in the one study that showed a slight benefit of 20 mg Nexium over 20 mg Prilosec, the results of which the FDA reviewer found non-significant, AstraZeneca compared essentially non-equivalent doses. According to one clinician, "40 mg esomeprazole vs 20 mg omeprazole is closer to quadruple the dose, not double ... and the 20 mg vs 20 mg study was not a fair comparison of equal doses." Dr. Barbara Mintzes, Centre for Health Services and Policy Research University of British Columbia, posting on EssentialDrugs.org, June 7, 2002, available at: http://www.essentialdrugs.org/edrug/archive/200206/msg0016.php. (last visited last visited February 14, 2005).

47.    Surprisingly, despite the greater amount of S-enantiomer in Nexium, Nexium does not work significantly better when comparing equal 20 mg doses of Nexium and Prilosec according to the FDA reviewer. Even though studies show that Nexium has greater bioavailability and controls gastric pH levels better than Prilosec, these differences do not translate into significantly better clinical outcomes.

48.    AstraZeneca used the flawed studies to promote Nexium as a superior product and launched a massive promotion campaign; it employed detailing and sampling advertising to target doctors, and used DTC advertising to target consumers. In its 2000 Annual Report, AstraZeneca claimed that:

> Nexium is the first PPI to offer significant clinical improvements over Losec in terms of acid control and clinical efficacy, shown in clinical studies involving over 30,000 patients performed across 20 countries. It is expected to establish a new, improved treatment standard for the PPI class.
>
> Nexium offers more effective acid inhibition than other PPIs and in the treatment of reflex oesophagitis, provides healing and symptom relief in more patients and in a shorter period of time than *Losec*.

> It is an effective, long-term therapy for GERD [gastroesophageal reflux disease] patients and can be taken when needed (on demand) to prevent relapse. For the treatment of active duodenal ulcers, seven-day *Nexium* triple therapy (in combination with two antibiotics for the eradication of H.pylori) heals most patients without the need for follow-up antisecretory monotherapy.

49.    AstraZeneca used these themes in a massive promotional campaign launched to have Nexium replace Prilosec. AstraZeneca sales representatives spent the years 2000 and 2001 pitching the superior qualities of Nexium. And, in the first ten months of 2001 alone, AstraZeneca spent almost $98 million on DTC promotions, falsely claiming Nexium as superior to Prilosec.

50.    Nexium advertisements directed to physicians claimed that the new drug was more powerful than Prilosec: "We captured the ESSENCE of Prilosec and created a NEW PPI ... introducing NEXIUM the POWERFUL new PPI from the makers of Prilosec...." (emphasis in original) (Exhibit B).

51.    Its 6,000 person sales force flooded doctors' offices with free samples and claims of Nexium's superiority. A June 6, 2002 *Wall Street Journal* article depicts one type of pitch made to doctors:

> Peter Halper, an internist at a large group practice in Manhattan, has a computer given him by a drug-marketing firm on the condition he chat with drug-Company marketers via the Internet from time to time. Recently, he checked in with AstraZeneca. The face of a salesman popped onto his screen, asking him how he was and then launching into a pitch for Nexium.
>
> Dr. Halper asked the salesman why Nexium was better.
>
> "The proof's in the healing rates," said the live salesman, who cited data comparing 40 mg. of Nexium to 20 mg. of Prilosec. "We're safer, with no drug-to-drug interactions. We're also the No. 1 proton-pump inhibitor among gastrointestinal specialists." While he spoke, several graphs flashed on the screen.

"So have I shown you how we differ from the other drugs?" the salesman asked. Dr. Halper said he had. "Do you need any more samples delivered?" No, Dr. Halper said, he had plenty.

Minutes later, two salesmen from AstraZeneca arrived to talk to Dr. Halper about Nexium. They made sure to restock his cabinet with free Nexium. Since many physicians view Prilosec and Nexium as virtually identical, they often prescribe whichever one is in their free-sample closet. Patients who begin with free samples often continue with paid prescriptions, so the freebies are effective marketing tools.

52.    No mention in this pitch was made of the fact that clinical studies showed that at equivalent doses, Nexium was not more effective than Prilosec

53.    AstraZeneca also engaged in a massive advertising campaign directed at consumers. The intent of these advertisements was to cause consumers to want to use Nexium. Studies show that such advertisements are effective in causing patients to pressure doctors into prescribing expensive and marginally helpful new drugs.

54.    The promotional campaign was massive in terms of spending and effort:

AstraZeneca last year [2002] spent $ 97.9 million on the consumer campaign for Nexium through October, placing the product as the third most-promoted prescription drug to consumers during this period.    This amount was 84.4% of AstraZeneca's total expenditure for direct-to-consumer advertising in the first 10 months of the year. The Company's direct-to-consumer campaign expenditure for Nexium totaled more than the entire consumer advertising efforts in that period for Abbott Laboratories (abbott.com), Eli Lilly & Co. (lilly.com), and Novartis (novartis.com). Nexium was the fourth most-promoted drug in medical journals in 2001, according to Perq/HCl.[5]

55.    Frequent promotion of Nexium advertisements on television and in magazines encourages patients to demand high-cost prescriptions for ailments that could be treated effectively with lower cost options.

---

[5]    http://www.epharmaceuticalnews.com/Features/34/Nexium-will-have-about-35-billion-in-total-peak-sales-in-2006.html (last visited April 14, 2005).

56.    A recent study by researchers at the Harvard School of Public Health (M.B. Rosenthal and A.M. Epstein), Massachusetts Institute of Technology (E.R. Berndt), and Harvard Medical School (3.M. Donohue and R.G. Frank) finds that Direct-to-Consumer ("DTC") advertising has a significant effect on prescription drug spending. *Demand Effects of Recent Changes in Prescription Drug Promotion*, June 2003, found at www.kff.org (last visited April 14, 2005).

57.    The truth is that there is no evidence that Nexium is superior to Prilosec:

> However, it appears that AstraZeneca, the manufacturer of Prilosec, has been remarkably successful in switching consumers to its newer and more expensive PPI: *Nexium* (esomeprazole), the "purple pill." Sales of omeprazole (both brand name Prilosec and generic) declined from $4 billion (February 2002 to January 2003) to $2.9 billion (February 2003 to January 2004), while sales of *Nexium* increased from $2.3 billion to $3.6 billion for the same time frame. The number of omeprazole (brand name and generic) prescriptions declined from 21.5 million to 17.1 million for those time periods, while the number of *Nexium* prescriptions increased from 15.1 million to 21.3 million, according to NDCHealth.
>
> This is remarkable since there is no evidence that Nexium is any more effective than Prilosec. The two medications are close chemical relatives. Prilosec is made up of two molecules which are mirror images of each other, while Nexium is made of one of those same molecules. Clinical trials found that 20 mg or 40 mg of Nexium is somewhat more effective than 20 mg of Prilosec in healing esophageal erosion. However, no tests were done to compare 40 mg of Nexium against 40 mg of Prilosec. "Some patients may need 20 mg while some need 40 mg," Dr. Abramowicz says. "When optimal doses are used, Prilosec and generic omeprazole appear to be as effective as Nexium or any other PPI."[6]

---

[6]    Elaine Zablocki, *Proton Pump Inhibitors Are The Preferred Treatment For Ulcers*," 14 Managed Healthcare Executive 4 (April 1, 2004).

58.    Moreover, AstraZeneca's ploy to retain market share by creating and deceptively marketing a mirror compound of its own drug marks a new era of pharmaceutical manipulation of the healthcare system. The situation was described as follows:

> It's tempting to dismiss Nexium as just another "me too" drug, one chemical notch away from the other PPIs, and one more example of a pharmaceutical company trying to make us think it has come up with something new. But, actually, Nexium signals a new pharmaceutical industry twist. Normally, a company makes a me-too drug to cut into a competitor's profits, but in this case, both Prilosec and Nexium are made by the same company. AstraZeneca's reason for competing with its own product is obvious. Prilosec (called Losec in Canada) will soon go off patent, and generic versions will become available at about two-thirds the cost.
>
> Gone is the pretense that carried the day for Prozac's competitors, who claimed that their me-too antidepressants (Zoloft, Paxil, etc) had fewer side effects. There is no significant difference in side effects between Prilosec and Nexium. Both drugs come in delayed-release form, so AstraZeneca has not introduced a new format. In fact, Nexium offers no innovation; the drug owes its existence entirely to AstraZeneca's need to retain the company's considerable share of the $8.3 billion PPI Market.

Maryann Napoli, *The Latest Heartburn Drug: Dressed Up In Purple, But Just Another Knock-Off - Nexium, available at* http:www.findarticles.com/p/articles/mi_m0815/is_2001_Sept/ai_77823684 (last visited April 14, 2005).

59.    The Los Angeles Times described the marketing of Nexium as follows:

> As an example, Cohen compares Nexium, the new stomach-acid controller, to Prilosec, which is virtually identical and for which a generic is available for a price about 10 times less. But once a patient tries Nexium and is doing well, he's not going to want to switch, Cohen says. "Every dollar that goes into these me-too" drugs that are virtually the same as existing drugs is a dollar that is bled out of the health-care system. Drug companies are looking for their profits and will squeeze it every way they can."

Fred Dickey, *The OD MD: Physician and Author Jay Cohen Says Pharmaceutical Companies Are Endangering Lives by Recommending Drug Doses That Are Too High for Many Patients*, Los Angeles Times Sunday Magazine (February 15, 2004) *available at* http://www.medicationsense.com/la_times_on_cohen.html (last visited April 14, 2005).

60.     The Oregon Health Resources Commission ("OHRC") released its Update Report

on PPIs in April 2004.   The Subcommittee conducted evidence based reviews of six PPIs:

Prilosec, Prilosec OTC, Nexium, Prevacid, Protonix, and Aciphex.

61.     The OHRC compared the six PPIs for esophagitis healing, relief of symptoms or

prevention of relapse in adult patients with GERD, finding:

> The PPI Subcommittee agrees by consensus that there is no overall
> clinically significant difference between proton pump inhibitors for
> esophagitis healing, relief of symptoms or prevention of relapse in
> adult patients with GERD.

Oregon Health Resources Commission, *Proton Pump Inhibitors Update Report*, *available at*
*http://www.oregon.gov/DAS/OHPPR/ORRX/docs/PPI/HRC_Report/PPI_Update_FINAL_4-27-
04.pdf* (last visited April 14, 2005).

62.     The OHRC found no evidence to support the use of one PPI over another:

> It is the decision of the HRC Proton Pump Inhibitor Subcommittee
> that the evidence does not demonstrate a clinical difference in
> efficacy to justify selection of any PPI as clinically superior to the
> other drugs in the class.

*Id.*

63.     The OHRC's findings are facts known to AstraZeneca but omitted from its sales

pitches and promotional campaign.   For instance, AstraZeneca promotes Nexium through a

commercial entitled "Better."   The script goes as follows:

> [If] I told you prescription Nexium heals acid-related damage of
> the esophagus *better*, you'd want proof.  And now, your doctor has
> that proof.   Recent medical studies prove Nexium heals that
> damage better than the other leading prescription medicine.   No
> wonder they call Nexium 'the healing purple pill.'

Contrary to AstraZeneca's advertisements, clinical studies reveal that Nexium is no "better" than

omeprazole.

64.     Sales of Prilosec have plummeted in response to generic competition and also

because of switching.  In its 2003 Annual Report, AstraZeneca's Chief Executive boasted of the

transformation from Prilosec to Nexium, trumpeting the $3.3 billion in Nexium sales achieved in less than three years after its introduction.

65.    Having established Nexium's position and capitalizing on brand loyalty, AstraZeneca then raised the price of Nexium. It now sells for $4.09 per pill versus $0.46 per pill for Prilosec OTC or between $1.19 and $3.19 for generic omeprazole available by prescription.

66.    A recap of Prilosec and Nexium sales reveals the success of Nexium in replacing Prilosec:

PRILOSEC VS NEXIUM SALES RECORDS
1998 THROUGH 1st HALF 2004

| YEAR | WORLDWIDE PRILOSEC/LOSEC | U.S. PRILOSEC | WORLDWIDE NEXIUM | U.S. NEXIUM |
|---|---|---|---|---|
| 1998 | 4,845,000,000[7] | | -- | -- |
| 1999 | 5,909,000,000[8] | | -- | -- |
| 2000 | 6,260,000,000[9] | | 17,000,000[10] | Launched |
| 2001 | 5,684,000,000[11] | 3,694,000,000[12] | 580,000,000[13] | 456,000,000[14] |
| 2002 | 4,623,000,000[15] | 2,847,000,000[16] | 1,978,000,000[17] | 1,525,000,000[18] |
| 2003 | 2,565,000,000[19] | 867,000,000[20] | 3,300,000,000[21] | 2,477,000,000[22] |
| 2Q 2004 | 1,071,000,000[23] | 208,000,000[24] | 1,826,000,000[25] | 1,280,000,000[26] |

[7]   Source: 2000 Annual Report p. 41 (Reported in U.S. dollars).
[8]   *Id.*
[9]   Source: 2000 Annual Report p. 38.
[10]  Source: 2001 Annual Report p. 7.
[11]  Source: 2001 Annual Report p. 7.
[12]  Source: 2001 Profit & Loss Statement p. 7.
[13]  Source: 2001 Annual Report p. 7.
[14]  Source: 2001 Annual Report pp. 34, 36.
[15]  Source: 2002 Annual Report p. 9.
[16]  Source: 2002 Profit & Loss Statement p. 8.
[17]  Source: 2002 Annual Report p. 9.
[18]  Source: 2002 Profit & Loss Statement p. 8.
[19]  Source: 2003 Annual Report pp. 5, 13.
[20]  Source: Consolidated Profit & Loss Statement p. 18.
[21]  Source: 2003 Annual Report pp. 1, 13.
[22]  Source: 2003 Annual Report pp. 13.
[23]  Source: 2004 Second Quarter Products Sales p. 17.
[24]  Source: *Id.*
[25]  Source: *Id.*
[26]  Source: *Id.*

## V. CLASS ALLEGATIONS

67.    Plaintiff seeks to represent all consumers in the United States who, from a point in time to be determined in accordance with further proceedings in this matter, and continuing through the present, have purchased Nexium rather than a less-expensive, equally-effective alternative (the "Class").

68.    The Class consists of tens of thousands of persons, making individual joinder impractical.  The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

69.    The claims of the representative Plaintiff are typical of the claims of the Class because he, like all Class members, has purchased Nexium, and has been harmed by AstraZeneca's misconduct because he would not have purchased Nexium if AstraZeneca had told the truth in its advertising.

70.    The factual and legal bases of AstraZeneca's misconduct are common to all Class members and represent a common thread of deception and other misconduct resulting in injury to the Plaintiff and all members of the Class.  Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving pharmaceutical sales.  Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither Plaintiffs nor his counsel has any interests adverse to those of the Class.

71.    There are many questions of law and fact common to the Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual Class members.  Common questions include, but are not limited to, the following:

(a)     Whether AstraZeneca's promotion of Nexium was misleading or deceptive;

(b)     Whether AstraZeneca's misleading or deceptive promotion of Nexium caused Plaintiff and members of the Class to pay for prescription Nexium, when prescription and over-the-counter Prilosec equivalents were available;

(c)     Whether and to what extent the conduct of AstraZeneca caused injury to Plaintiff and the Class, and if so, the appropriate measure of damages;

(d)     Whether AstraZeneca's misrepresentations concerning Nexium have violated, and continue to violate, the Delaware Consumer Fraud Act; and

(e)     Whether Defendants should be ordered to disgorge, for the benefit of the Class, all or part of its ill-gotten profits received from the sale of Nexium, and/or to make restitution to Plaintiff and the members of the Class.

72.     Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of AstraZeneca's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. Because of the relatively small size of each individual Class member's claims, few Class members likely could afford to seek legal redress for AstraZeneca's misconduct. Absent a class action, Class members will continue to suffer harm and AstraZeneca's misconduct will proceed without remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. Additionally, AstraZeneca has acted and failed to act on grounds generally applicable to the representative Plaintiff and the Class and require Court imposition of relief as to the Class as a whole.

## FIRST CAUSE OF ACTION
### (On Behalf of the Nationwide Class)
### (6 Del. C. § 2511, *et seq.*)

73.    The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.  Plaintiff asserts this claim on behalf of himself and the members of the Class throughout the United States.  AstraZeneca's actions, as complained of herein, constitute false, misleading or deceptive acts and practices, which are unlawful pursuant to 6 Del. C.  § 2511, *et seq.*

(a)    AstraZeneca's promotion of Nexium as "more powerful," offering "significant improvements over Prilosec," and as being "more effective" was intentionally false and/or misleading in that except for rare patients, none of the above are true; in comparable doses, Nexium is not more effective.  In the 40 mg Nexium to 20 mg Prilosec comparison there was only a slight improvement for erosive esophagitis.  Further, Nexium is far more expensive than comparable drugs and, in fact, Nexium was promoted solely for financial reasons and not due to any advance in medical efficacy;

(b)    AstraZeneca intended to deceive and mislead: (a) doctors, whose prescribing practices dictate which pharmaceutical products Class members will purchase; (b) and the Class members purchasing the pharmaceuticals.  AstraZeneca accomplished its objective by claiming the superior efficacy of Nexium over Prilosec, and by its misrepresentations and omissions as to, *inter alia*, the description, quality, and characteristics of Nexium.  AstraZeneca knew that if it succeeded, Class members would pay for hundreds of millions of dollars for Nexium rather than far lesser amounts for generic omeprazole available by prescription or Prilosec OTC, all to the benefit of AstraZeneca.

(c)    AstraZeneca's conduct was deceptive in that AstraZeneca omitted from its advertisements and promotions studies that demonstrated that Nexium was not more effective

- 22 -

than Prilosec, and was not more effective at equivalent doses to the then therapeutic dose of Prilosec, and failed to disclose this fact to doctors while promoting the drug;

(d)    AstraZeneca's conduct was deceptive in that by promoting Nexium as superior directly to consumers, AstraZeneca created demand for Nexium that would not have existed if AstraZeneca had disclosed the true cost and equivalence of Nexium relative to prescription and OTC Prilosec and/or other PPIs;

(e)    AstraZeneca omitted material information known to it to induce doctors to prescribe Nexium, and to induce consumers to request Nexium, and this information included the fact that there was no basis to tout Nexium as superior.

(f)    AstraZeneca's conduct in selling Nexium at a cost below Prilosec to establish brand loyalty, while secretly intending to raise prices once such loyalty was established, was misleading and deceptive;

(g)    AstraZeneca's conduct in sending sales teams into doctors' offices with free samples and false promotional material, while knowing that many doctors do not have the time to analyze clinical studies and thus rely on deceptive promotional literature, was misleading and deceptive; and

(h)    AstraZeneca's conduct in launching a promotional campaign to promote a drug that is not statistically proven to be more effective and is not beneficial from a cost/benefit analysis is misleading and deceptive.

74.    All of the conduct alleged herein occurs and continues to occur in AstraZeneca's business. AstraZeneca's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

75.    AstraZeneca's unlawful conduct arose, was directed and emanated from Delaware to the detriment and injury of class members in Delaware and throughout the United States.

76.    AstraZeneca's campaign of deception succeeded in diminishing prescriptions for generic and over-the counter Prilosec, causing Plaintiff and the Class to purchase Nexium, and therefore pay far more for esomeprazole than they otherwise would have.

77.    The conduct alleged herein violates the Delaware Consumer Fraud Act, 6 Del. C. Ann. § 2511, *et seq.* in that AstraZeneca, by its misrepresentations and false statements regarding the superior efficacy of Nexium compared to Prilosec, affected the conduct of trade and commerce.

78.    Plaintiff and the Class have been damaged and may continue to incur damages as a proximate result of AstraZeneca's past and ongoing course of conduct and continuing violations of the Delaware Consumer Fraud Act in that class members paid more for Nexium than they would have paid for prescription omeprazole or over-the-counter Prilosec had AstraZeneca not violated the Delaware Consumer Fraud Act.

79.    As a result of AstraZeneca's unlawful conduct, Plaintiff and members of the Class have suffered a loss and have paid inflated prices for Nexium.

80.    Plaintiff and members of the Class seek compensatory damages for their injuries caused by these violations, plus punitive damages in an amount to be determined.

## SECOND CAUSE OF ACTION

### Unjust Enrichment

81.    The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

82.    To the detriment of Plaintiff and the Class, AstraZeneca has been, and continues to be, unjustly enriched as a result of the unlawful and/or wrongful collection of, inter alia, charges for Nexium, when an equivalent version is available at lower cost to Plaintiff and the Class.

83.    AstraZeneca has unjustly benefited through the unlawful and/or wrongful collection of, *inter alia*, charges for Nexium, and continues to so benefit to the detriment and at the expense of Plaintiff and the Class.

84.    Accordingly, Plaintiff and the Class seek full restitution of AstraZeneca's ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## JURY DEMAND

85.    Plaintiff demands a jury, pursuant to Rule 38 of the Federal Rules of Civil Procedure, of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class request that the Court enter an order or judgment against AstraZeneca Pharmaceuticals LP and Zeneca, Inc. as follows:

A.    Certification of the Class and appointment of Plaintiff as Class Representative, and counsel of record as Class Counsel;

B.    Damages on account of AstraZeneca Pharmaceuticals LP and Zeneca, Inc.'s unlawful conduct;

C.    Prejudgment and post judgment interest on such monetary relief, awarded in accordance with Delaware law;

D.    An order awarding Plaintiff the costs of bringing this suit, including attorneys' fees; and

E.    All other relief to which Plaintiff and members of the Class may be entitled.

Dated: April 14, 2005

CHIMICLES & TIKELLIS LLP

Pamela S. Tikellis (#2172)
Robert J. Kriner, Jr. (#2546)
A. Zachary Naylor (#4439)
Robert R. Davis (#4536)

One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Telephone: (302) 656-2500
Facsimile: (302) 656-9053

*Attorneys for Plaintiff*

Of Counsel:

MILLER FAUCHER and CAFFERTY LLP
Ellen Meriwether
Bryan L. Clobes
One Logan Square
18th & Cherry Streets, Suite 1700
Philadelphia, Pennsylvania 19103
Telephone: (215) 864-2800
Facsimile: (215) 864-2810

CHIMICLES & TIKELLIS LLP
James R. Malone, Jr.
Michael D. Gottsch
Daniel B. Scott
Timothy N. Mathews
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633